*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DEVANTA JAMARI GLASPER,

        Defendant-Appellant.

UNPUBLISHED
May 21, 2026
9:54 AM

No. 367027
Kent Circuit Court
LC No. 21-005049-FC

Before: WALLACE, P.J., and LETICA and FEENEY, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial conviction of felony murder, MCL 750.316(1)(b). Defendant was sentenced as a third-offense habitual offender, MCL 769.11, to life imprisonment without the possibility of parole (LWOP). We affirm.

## I. FACTUAL BACKGROUND

This case arises from the shooting death of Markel Williams on January 6, 2021, at the Clarion Hotel in Cascade Township. Williams and his girlfriend, Myarri Nelson, were staying at the hotel at the time. Williams frequently carried a brown and tan backpack containing all his belongings.

That day, defendant arrived at the hotel in a gray or silver Jeep to see Jonqual Shaw, who was also staying at the Clarion. Defendant testified that he and Shaw met up with Williams to sell Williams marijuana two times. He said the first transaction occurred in the parking lot, the second inside the hotel stairwell. Security video from inside the hotel captured defendant and Shaw walking through the hallways wearing dark clothing and ski masks, following Williams's path. At one point in the afternoon, Williams called Nelson and told her he wanted to leave the hotel because a gray vehicle was present that he recognized. So Nelson returned to the hotel from work, met up with Williams, and told her to pull her car around to a back entrance and wait for him. When Nelson was at the back door, she saw Williams exit the hotel carrying his backpack, and there were two men behind him wearing ski masks. One man grabbed Williams from behind, placing him in a chokehold. When Nelson exited her car to help, the man holding Williams pointed a gun at her, so she ran away. Nelson then heard gunshots, so she ran back, and Williams was on

-1-

the ground, having been shot, and without his backpack. Another guest of the hotel, Aubree Aquino, also encountered two masked men in the hotel vestibule, and after she walked outside, she saw the same two men attacking a third. Nelson performed CPR on Williams until law enforcement and emergency medical services arrived, but he died from the gunshot wounds.

At trial, a pathologist testified that Williams was struck by two bullets, both of which entered his back, and both of which were fatal (one bullet struck his lung, causing significant hemorrhaging, and the other struck his aorta).

Defendant testified that he alone met Williams to make the second marijuana sale, they started to argue, and ultimately physically fought from inside the hotel to outside. Defendant testified that Williams had a gun, and when Williams tried to brandish it, defendant fought him, taking Williams to the ground. According to defendant, Williams's gun went off through his jacket pocket and shot defendant in the leg. Defendant fell back and shot Williams twice with his own gun, then took Williams's gun and backpack, and ran back inside the hotel to Shaw's room.

The security footage taken from before and after the shooting portrayed defendant wearing all black clothing and gold shoes before the shooting, but afterwards he was wearing a different shoe on one of his feet. Shaw was initially wearing a red and black sweatshirt, changed into a black sweatshirt or jacket prior to the shooting, and then back into the red and black sweatshirt afterwards. A trail of blood was found running through the Clarion Hotel and to another hotel nearby. The blood was tested, and defendant was found to be the main contributor. Defendant's other gold shoe, covered in blood, was recovered by police in the Clarion Hotel dumpster.

After the shooting, Shaw's girlfriend picked up defendant and Shaw and took them to Trayveon Jackson's house in Grand Rapids. Jackson helped stitch up defendant's gunshot wound, and he overheard Shaw apologize to defendant for shooting him. Shaw sold Jackson a laptop computer out of a brown or tan bookbag. This laptop was recovered by police and Nelson later identified that it was hers and that it had been in Williams's backpack. After this incident, defendant fled the state to Chicago, where he sold his and Williams's guns. He then went to Arizona, where he was discovered by police and extradited back to Michigan to be charged with this crime.

There was testimony at trial that a jail trustee, Tyson Tolliver, attempted to deliver a letter from Shaw to defendant in jail.[1] Defendant did not accept the letter or read it at that time. So Tolliver read the letter and gave it to Williams's mother because Williams was Tolliver's godson. Tolliver testified that, in the letter, Shaw apologized to defendant for shooting him.

## II. PROCEDURAL HISTORY

Defendant was charged with open murder, MCL 750.316; felony murder, MCL 750.316(1)(b); armed robbery, MCL 750.529; and three counts of carrying a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The prosecution offered defendant a proffer agreement, dated May 6, 2022, indicating that if defendant gave a statement, it would not

---

[1] Shaw's letter was marked as an exhibit by the prosecution, but never admitted into evidence.

be used to charge or prosecute him, and he would be sentenced to a 20-year minimum term under a plea agreement. Defendant agreed, gave a proffer interview, and stated that he shot Williams after Williams shot defendant in the leg, and Shaw was not involved. After giving the statement indicating he was the shooter, the prosecution revoked the proffer agreement, on the basis that defendant lied to them, in violation of the terms of the agreement. Defendant was then tried solely on the felony-murder charge that included the armed robbery, with the prosecutor dismissing the other charges. The jury found defendant guilty of felony murder and he was sentenced to mandatory life without parole (LWOP). Shaw was tried separately.

Postjudgment, defendant moved for specific performance of the proffer agreement. He argued that he agreed to cooperate and tell the truth in exchange for a 20-year minimum sentence, the prosecution breached the agreement resulting in defendant's sentence of LWOP, and he was entitled to resentencing. While the prosecution's theory was that Shaw was the shooter, rather than defendant, defendant essentially argued that he told the truth, consistent with the agreement, because defendant shot Williams (in self-defense). Defendant also filed a postjudgment motion in the trial court for a new trial or evidentiary hearing, arguing that the testifying detectives improperly narrated the hotel security footage, the prosecutor improperly shifted the burden of proof onto defendant, and the prosecutor committed misconduct by injecting innuendo into trial that defendant changed his story to match Shaw's. Defendant argued that counsel was ineffective for failing to object to these issues at trial. The prosecution opposed both motions, and after hearing oral argument, the trial court denied each of them.

After filing his claim of appeal, defendant also moved this Court to remand for an evidentiary hearing on the issues raised in his postjudgment motions. In this motion, defendant also raised two additional issues: (1) that the prosecutor improperly read the letter drafted by Shaw into the record to establish defendant was lying and counsel was ineffective for failing to object or moving to strike; and (2) defendant's mandatory LWOP sentence constituted cruel or unusual punishment under the Michigan Constitution. This Court denied the motion. *People v Glasper*, unpublished order of the Court of Appeals, entered November 26, 2024 (Docket No. 367027).

III. PROFFER AGREEMENT

Defendant argues that because he fulfilled his obligation under the proffer agreement, i.e., he told the truth, he is entitled to specific performance of the agreement and resentencing to the promised 20-year minimum. We disagree.

Agreements between defendants and prosecutors affecting the disposition of criminal charges are reviewed within the context of their function to serve the administration of criminal justice. *People v Jackson*, 192 Mich App 10, 15; 480 NW2d 283 (1991). "Strict contractual theories and principles peculiar to commercial transactions may not be applicable." *Id*. Thus, review of the bargain is based not only on the terms of the agreement, but also "on whether the ends of justice are served by enforcing its terms." *Id*.

The proffer agreement in this matter was drafted on May 6, 2022, by the same assistant prosecuting attorney who tried this case. It was directed to defendant's previous attorney, and stated:

-3-

We are offering your client, Devonta [sic] Glasper, the opportunity to give a proffered statement. A proffered statement allows him to give a statement and potentially help himself and in exchange we will promise that we will not use this statement against him in anyway [sic] unless you fail to meet certain conditions.

This letter ensures that if you give a truthful and complete statement and agree to cooperate, we cannot use your statement against you in any way whether it would be to charge you or prosecute you. We would also agree to the plea agreement previously discussed and agree to a sentence of 20 years with credit for the time he has served. And any other plea that is agreed upon on the currently charged cases would run concurrently. This promise remains in place unless he lies to us, put[s] on a defense inconsistent with the statement, he testifies later inconsistent to the statement, or later refuses to cooperate and testify.

Defendant's proffer interview took place on June 7, 2022. It was conducted by Detective Dustin Cook and Detective John Tuinhoff from the Grand Rapids Police Department. Although the proffer agreement was dated May 6, 2022, the interview was delayed because of a COVID-19 quarantine at the jail. The detectives explained that, as stated in the letter, as long as defendant was truthful and met the requirements of the letter, his statement could not be used against him. Defendant stated that he got into a physical altercation with Williams, Williams shot defendant first, and defendant fired back. Defendant denied that Shaw shot him, said that Shaw was not even present until the altercation was underway, and that he told the police everything he remembered from that day.

The prosecution argues that it withdrew the proffer agreement because defendant lied throughout the interview. While defendant argues that there is no evidence that he lied, there was actually an overwhelming amount of evidence introduced at trial indicating that Shaw took part in the incident, despite defendant's statements indicating that Shaw was not there when the altercation began and only arrived after he and Williams were already fighting, i.e., the evidence strongly suggested that defendant lied to police about Shaw's involvement, in violation of the agreement.[2] It was undisputed that Shaw was taller than both defendant and Williams. Nelson testified at trial that she saw two men in ski masks follow Williams, that the taller of the two men then put Williams in what was described on the record as a chokehold, and that the taller of the two pointed a gun at her. Another guest of the hotel, Aquino, likewise testified that she saw two men in ski masks fighting with a third man at the time of the incident, during which she also heard gunshots. Security video shows that Shaw and defendant were wearing dark colored ski masks.

---

[2] After defendant told police that Williams brandished a gun, and that he and Williams then began "tussling," he was asked who was present (at that time). Defendant responded, "[i]t is just me and then—it is me and him at first. And then Shaw eventually come out—come downstairs. And we . . . already tussling and on our way out the door." At no point during the interview did defendant state that Shaw was involved in the altercation, other than saying that Shaw looked at them when he came downstairs, after which Shaw ran back up the stairs to his room.

-4-

Williams was not wearing a ski mask.[3]  Additionally, with regard to the security footage taken inside the hotel, all of the footage depicting defendant likewise depicts Shaw, i.e., all of the interior footage shows them together.  Thus, the evidence supports the prosecution's assertion that defendant lied when he said that Shaw was not present when the altercation began, and that he likewise lied by indicating that Shaw was not involved in the altercation.

The authority of a prosecutor to bargain with defendants is well established and is recognized as "an essential component of the efficient administration of justice." *Jackson*, 192 Mich App at 14-15.

> Underlying this authority is the broad discretion granted by the constitution and statutes to a prosecutor, as the chief law enforcement officer of a county, to decide whether to prosecute or what charges to file.  However, there are some proscriptions on the prosecutor's exercise of discretion.  Judicial review of decisions by the prosecutor is appropriate where the decisions are unconstitutional, illegal, or ultra vires, or where the prosecutor has abused the power confided in him.  [*Id*. at 15 (citations omitted)].

The prosecution appealed the trial court order dismissing a charge of bank robbery in *Jackson*, a case in which the defendant was alleged to have driven the getaway car but gave information to police that allowed them to apprehend the principal perpetrator at a time when the bulk of the money was still in his possession.  *Id*. at 10-11, 16.  She later voluntarily disclosed the location of the remaining stolen money.  *Id*. at 16.  The defendant was told that if she cooperated fully and was not involved, she would not be charged, and she told the police everything she knew. *Id*. at 13.  However, she was nonetheless charged with one count of bank robbery and moved to dismiss the charge based on the agreement.  *Id*.  The prosecution responded that the defendant's failure to immediately inform the police about hidden money violated the terms of the cooperation agreement and indicated the defendant actually was involved in the robbery.  *Id*.  The trial court disagreed and dismissed the charge.  *Id*. at 13-14.  On appeal, this Court determined that, under the facts in *Jackson*, no benefit was conferred on the defendant for her cooperation and reliance on the agreement.  *Id*. at 16.

> If defendant was involved, she had no reason to cooperate if she could still be charged and the information she provided could be used against her to support the charge.  If she was not involved, the prosecution should not have charged her, even if she withheld her cooperation.  If we accept the prosecutor's interpretation of the agreement, any benefit conferred to defendant would be nonexistent and the bargain illusory.  [*Id*.]

---

[3]  Prior to the incident, Williams was seen speaking to the front desk receptionist, who handed him a light blue ear loop mask (again, during the COVID-19 pandemic), which he only partially put on (it covered only his mouth).  However, the light-colored ear loop mask did not look like a ski mask. We also note that defendant did not testify that Williams was wearing a mask during the altercation.

Thus, we found that "in order to maintain the integrity of the criminal justice system the charge must be dismissed." *Id*. To allow the prosecutor to charge the defendant would render the promises meaningless and be an abuse of the prosecutor's authority in light of the disparity between the bargaining parties. *Id*. at 16-17. Moreover, the prosecutor's personal involvement in the case made the agreement binding, and because there was an enforceable agreement not to prosecute, the proper remedy was specific enforcement. *Id*. at 17. Thus, the order dismissing the charge was affirmed. *Id*. at 18.

This case is distinguishable from *Jackson*. While there was no evidence in *Jackson* indicating that the defendant failed to comply with the agreement she reached with the prosecutor, defendant in the present case breached the agreement by lying about the involvement of Shaw in the altercation with Williams, as described above. The only evidence in this matter that supported defendant's testimony about Shaw's noninvolvement was the self-serving testimony of defendant himself, which was contradicted by security videos and two eyewitnesses, and obviously not believed by the jury.

For these reasons, we find that the trial court did not err by denying defendant's motion for specific performance of the proffer agreement.

IV. NARRATION TESTIMONY

Defendant argues that the trial court abused its discretion by allowing two testifying detectives to narrate and tell the jury what could be seen in the Clarion security videos, thereby invading the province of the jury, and further abused its discretion by denying defendant's motion for a new trial on this basis and on the basis that his counsel was ineffective for failing to object at the time of trial. We disagree.

"To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal." *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019). Defense counsel did not object to any of the prosecutor's questioning of Detective Paul VanRhee. He also did not object to a statement by Detective Cook about persons on the video appearing to be "casing someone." Defendant argues that he preserved this issue by raising it in his motion for new trial, but that assertion is contradicted by this Court's decision in *People v Butsinas*, ___ Mich App ___; ___ NW3d ___ (2025) (Docket No. 364778), where we held that "a party asserting evidentiary error who fails to object at a time that gives the trial court the opportunity to correct the error does not preserve that evidentiary error by raising it for the first time in a postjudgment motion for a new trial." *Id*. at ___; slip op at 10.

> [W]e conclude that permitting a party to raise an evidentiary issue for the first time in a postjudgment motion for new trial, whether in this Court or in the trial court, controverts the purpose of the preservation requirement because the opportunity for the trial court to correct the error and its prejudice has passed. We hold that making such a posttrial motion does not preserve the issue sought to be raised in the same manner a timely motion or objection during trial would have, so review of the unpreserved issue is for plain error affecting substantial rights. [*Id*. at ___; slip op at 12].

-6-

Thus, this issue is unpreserved and will be reviewed for plain error.

"To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id.*, quoting *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id.*, quoting *Carines*, 460 Mich at 763. In cases in which these three requirements are met, reversal is warranted only where the result of the error was "the conviction of an actually innocent defendant or error that seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings' independent of the defendant's innocence." *Id.*, quoting *Carines*, 460 Mich at 763 (alteration in original).

Whether a defendant was denied the effective assistance of counsel generally presents a mixed question of fact and constitutional law. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). Findings of fact are reviewed for clear error, and questions of law are reviewed de novo. *Id.* Because this Court denied defendant's motion to remand and no *Ginther*[4] hearing was held, this Court's review is limited to errors apparent on the existing record. *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020).[5]

At the time of defendant's trial in 2023, MRE 701 provided:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.[6]

MRE 701 governs lay opinion testimony, and MRE 702 governs expert testimony. Neither Detective Cook nor Detective VanRhee were qualified as experts when they testified at trial.

In *People v Fomby*, 300 Mich App 46, 48; 831 NW2d 887 (2013), the defendant argued that the lay opinion testimony of a police officer regarding the identity of individuals in still photos and security footage invaded the province of the jury because the conclusions and opinions regarding the identities of the people could have been drawn by the jury. The officer identified individuals in still photos taken from security videos to determine whether the suspects involved in a shooting had been to a gas station before a murder. *Id.* at 49. The officer never testified that

---

[4] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[5] The Michigan Supreme Court has stressed the importance of not conflating plain error analysis with the analysis for ineffective assistance of counsel, stating that "the specific error that is the focus of each standard is different." *People v Randolf*, 502 Mich 1, 10; 917 NW2d 249 (2018).

[6] The Michigan Rules of Evidence were amended effective January 1, 2024, and although MRE 701 was slightly reworded and reformatted, the court rule still limits lay testimony to opinions rationally based on the witness's perception and helpful to clearly understanding the witness's testimony or to determine a fact in issue. All citations to the Michigan Rules of Evidence will be to the version of the rule in effect at the time of defendant's trial.

any individual depicted in the security footage or still photographs was the defendant. *Id*. This Court held that the officer's testimony was properly admitted as lay opinion testimony under MRE 701 because it was rationally based on his perception, *id*. at 50, because it was intended to provide a clearer understanding of whether the suspects had been to a gas station earlier in the day, *id*. at 51, and because it did not invade the province of the jury, *id*. at 52. The officer was not present at the scene when the incidents occurred but scrutinized the video and created the still images to draw his conclusions. *Id*. at 50-51. Where there were six hours of security video, it could be inferred that the testimony helped the jury correctly and efficiently determine this fact question. *Id*. at 52. The officer did not invade the province of the jury as he did not ever identify the defendant, and a witness cannot express an opinion on the guilt or innocence of the defendant. *Id*. at 53. As such, the officer's testimony was admissible. *Id*.

Here, at trial, Detective VanRhee testified that he learned how to review security videos through training and experience. He was tasked with reviewing security footage from the Clarion Hotel. It had many cameras, inside and outside, at many angles, with correct time stamps. To focus on potential suspects, he backtracked from the time of the shooting and looked for people who were present or appeared to look suspect. From the video, he focused on two individuals and followed their route through the hotel. He did not yet know their identities. He was informed to look for a Jeep in the footage as well. None of the cameras caught the actual shooting.

When the prosecutor showed Detective VanRhee the video in which the two suspects were walking in the same hallway and in the same direction as Williams, he testified that the two men ducked into a doorway, seemingly to hide. The prosecutor asked, based on his experience, why someone would duck into a doorway like that, and Detective VanRhee answered:

> To me, in my training and experience, it would be to duck out of the way so that they're not seen, especially with kind of the motion that they did there. It was quick and abrupt. That would be my take on that.

When shown video of the two men peering around the corner in the hallway and then backing up, the prosecutor asked Detective VanRhee what was seen, and he answered:

> And based on my experience, they're—they're—the way they're walking in this is very suspicious. They walk slowly up to the hallway and—and carefully look left and right, both of them do at different times, and then they retreat out that—the same direction that they came in from.

A minute later, video showed the suspects back by the entrance from which they arrived, and as testified by Detective VanRhee, they were "again acting suspicious, carefully looking around, looking in all directions" and that they "appear[ed] to be looking for something." When asked to "summarize [his] observations" from the video for the jury, Detective VanRhee, in part, said the two men were together the whole time, in the same clothing, acting suspicious, and after the time of the shooting one changed his shoe and the other his sweatshirt, they were walking faster, and one had a backpack. Similarly, when Detective Cook was asked what his impression was of the security footage based on his knowledge and experience, Detective Cook testified that, based on his many years of police investigation, including watching a lot of security videos,

defendant's and Shaw's actions were "indicative of casing someone, looking for something, preparing to do something."

The testimony of both detectives was properly admitted as lay opinion testimony under MRE 701. Their testimony was rationally based on their perception of the security camera footage. *Id*. Neither officer was present at the hotel when the shooting occurred but closely scrutinized the videos. *Fomby*, 300 Mich App at 50-51. The detectives' lay opinion testimony was also intended to provide a clearer understanding of their testimony or assist with determining a fact in issue. MRE 701(b). Detective VanRhee testified about over 20 videos taken from different cameras in different locations of the hotel to establish the path Williams and the two masked men traveled. Like *Fomby*, 300 Mich App at 52, it can be reasonably inferred that the detectives viewed the footage several times to reach their conclusions, and that their testimony helped the jury determine whether the masked men were involved in the crime.[7] Detective VanRhee did not identify defendant as either masked man in the videos. Detective Cook testified that Shaw was eventually identified as one of the men through a tracking device, and defendant was identified as the other, which defendant did not dispute. As such, it does not appear that the testimony of Detective VanRhee or Detective Cook invaded the province of the jury, and the trial court did not err by admitting this evidence or denying defendant's motion for a new trial on this basis.

Defendant argues that trial counsel was ineffective for failing to object to the detectives' testimony. To prove ineffective assistance of counsel, the defendant must show that "(1) defense counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that counsel's deficient performance prejudiced the defendant." *People v Lane*, 308 Mich App 38, 68; 862 NW2d 446 (2014). "Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018) (quotation marks, brackets, and citation omitted). "In examining whether defense counsel's performance fell below an objective standard of reasonableness, a defendant must overcome the strong presumption that counsel's performance was born from a sound trial strategy." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012). To establish prejudice, the defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018) (quotation marks and citation omitted). The defendant bears the burden of establishing the factual predicate for his ineffective-assistance claim. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

In this matter, because we have determined that the evidence was admissible, defendant is unable to demonstrate that there is a reasonable probability that he was prejudiced by his counsel's failure to object to this evidence. See *Lane*, 308 Mich App at 68-70.

---

[7] We note that our review of this matter likewise required viewing the surveillance videos several times to appreciate all the nuances of the evidence contained therein.

## V.  BURDEN SHIFTING

Defendant argues that he was denied a fair trial because the prosector improperly shifted the burden of proof onto defendant during closing argument and rebuttal, and defense counsel was ineffective for failing to object.  We disagree.

A defendant must contemporaneously object and request a curative instruction to preserve an issue of prosecutorial error for appellate review.  *People v Solloway*, 316 Mich App 174, 201; 891 NW2d 255 (2016).  Defense counsel did not object to the prosecutor's statements during closing argument or rebuttal.  Thus, the underlying issue of prosecutorial error is unpreserved.  *Butsinas*, ___ Mich App at ___; slip op at 10.

This unpreserved issue of prosecutorial error is reviewed for plain error affecting substantial rights.  *People v Lowrey*, 342 Mich App 99, 108; 993 NW2d 62 (2022).  Again, to establish plain error, it must be shown that: an error must have occurred, the error was plain, i.e., clear or obvious, and the plain error affected defendant's substantial rights, i.e., defendant was prejudiced.  *Id*.  "A defendant must, in relevant part, show that the error affected the outcome of the proceedings or intrinsically undermined the fairness, integrity, or public reputation of the proceedings."  *Id*. at 109.

As stated above, whether a defendant was denied the effective assistance of counsel presents a mixed question of fact and constitutional law.  *Heft*, 299 Mich App at 80.  Findings of fact are reviewed for clear error, and questions of law are reviewed de novo.  *Id*.  Because this Court denied defendant's motion to remand, and no *Ginther* hearing was held, this Court's review is limited to the existing record.  *Abcumby-Blair*, 335 Mich App at 227.

Review of a claim of prosecutorial error requires a determination "whether the defendant was denied a fair and impartial trial."  *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010).  "[A]llegations of prosecutorial misconduct are considered on a case-by-case basis, and the reviewing court must consider the prosecutor's remarks in context."  *Id*.  In general, prosecutors are afforded great latitude in their arguments and conduct; they are free to argue the evidence and all reasonable inferences arising from it as it relates to their theory of the case.  *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995).  The prosecutor may argue from the facts that a witness should be believed and is not required to phrase his argument in the blandest terms possible.  *People v Ullah*, 216 Mich App 669, 678; 550 NW2d 568 (1996).

The prosecutor may not shift the burden of proof from the prosecution to the defendant:

> A prosecutor may not imply in closing argument that the defendant must prove something or present a reasonable explanation for damaging evidence because such an argument tends to shift the burden of proof.  Also, a prosecutor may not comment on the defendant's failure to present evidence because it is an attempt to shift the burden of proof.  However, a prosecutor's argument that inculpatory evidence is undisputed does not constitute improper comment.  A prosecutor may also argue that the evidence was uncontradicted even if the defendant is the only person who could have contradicted the evidence.  [*People v Fyda*, 288 Mich App 446, 463-464; 793 NW2d 712 (2010) (citations omitted).]

-10-

During closing argument, the prosecutor made the following comments.

> We have two versions of events. We have version 1, which was all the evidence presented at trial, all the witnesses, all the physical evidence, all the videos, all that supports one thing. And then we have the defendant's statement without any corroboration on the other side. So, you have to decide which side to believe, right?

Later, the prosecutor argued that the facts as described by Nelson and Aquino were corroborated by the other evidence. Additionally, the prosecutor said that defendant's story did not have any support from the evidence because it was not real, it was made up to get out of this case, and it was the role of the jury to decide what the evidence was. The prosecutor argued that the videos and testimony all suggested that defendant was guilty. The prosecutor also said that defendant's claim of self-defense was not supported by any fact that is corroborated, it was just defendant's fabricated story.

During rebuttal, the prosecutor asserted that defendant's last option was to argue self-defense because he was shot. And for the jury to excuse his actions as self-defense, the jury would have to "believe his version of events, which is uncorroborated by any single piece of evidence." He also said defendant had nothing to support his statements, and "you would have to basically take all of my evidence, all of this, and throw it in the garbage and say forget it. Whatever [defendant] says is true, and everything else is a lie, because you have two completely different versions of events. One supported and corroborated, and one isn't." The prosecutor also said he did not know why defendant was protecting Shaw, but defendant was liable, and his story was not corroborated or supported by any single fact. At the end of rebuttal, the prosecutor again stated that all of the evidence the prosecution presented was corroborated and nothing defendant said was supported by any evidence.

Read in context, it does not appear that the prosecutor's remarks impermissibly shifted the burden to defendant to prove his innocence or his theory of self-defense. The prosecutor's remarks must be considered in context of the whole of closing arguments and in consideration of defendant's arguments. *People v Thomas*, 260 Mich App 450, 454; 678 NW2d 631 (2004). Defendant's theory of the case was self-defense—that because Williams shot defendant first, defendant's shooting of Williams was justified by self-defense. Even though the prosecutor said many times that defendant's theory or story was not corroborated by other evidence, he did not say that defendant had to produce evidence to corroborate his self-defense theory or version of events. Rather, the record evidence did not support defendant's theory. The comments in question challenge defendant's theory of self-defense, and attacking the credibility of the theory advanced by the defendant does not shift the burden of proof. See *Fyda*, 288 Mich App at 464. As such, the prosecutor's statements were proper commentary on the weaknesses of defendant's theory of self-defense and did not constitute prosecutorial error, *id*. at 465, or plain error.

Moreover, during preliminary jury instructions, the court informed the jury that after the prosecution rested, the defendant may offer evidence, but such is not required. The court said, "By law, the defendant does not have to prove his innocence or produce any evidence." The court also instructed on the presumption of innocence:

-11-

A person accused of a crime is presumed to be innocent. This means that you must start with the presumption that the defendant is innocent. This presumption continues throughout the trial and entitles the defendant to a verdict of not guilty unless you are satisfied beyond a reasonable doubt that he is guilty.

During final jury instructions, the court again instructed the jury that defendant was presumed innocent, the prosecutor had to prove each element of the crime beyond a reasonable doubt, and defendant was not required to prove his innocence. The court also instructed the jury that the lawyers' statements, arguments, and commentary were not evidence, and only meant to help understand the evidence and each side's legal theories. These instructions are deemed to cure any defect, and jurors are presumed to follow their instructions. *Id*. Thus, to the extent the prosecutor made any improper commentary, it was cured by the jury instructions.

Lastly, because the challenged comments by the prosecutor did not amount to improper burden shifting, defense counsel was not ineffective for failing to raise a futile objection or make a meritless argument. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) ("Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel.").

## VI. PROSECUTOR MISCONDUCT

Defendant argues that he was denied a fair trial and the prosecutor committed misconduct by inserting innuendo into cross-examination that defendant changed his story at his proffer interview. We disagree.

As stated above, to preserve a claim of prosecutorial misconduct, the defendant must timely and specifically challenge the prosecutor's statement or conduct. *People v Thurmond*, 348 Mich App 715, 735; 20 NW3d 311 (2023). Defense counsel did not object during the prosecutor's questioning of defendant during cross-examination, therefore, defendant's underlying argument is not preserved. This unpreserved issue is reviewed for plain error affecting substantial rights, i.e., an error must have occurred, the error was plain, i.e., clear or obvious, and the plain error affected defendant's substantial rights, i.e., defendant was prejudiced. *Lowrey*, 342 Mich App at 108.

As stated above, whether a defendant was denied the effective assistance of counsel presents a mixed question of fact and constitutional law. *Heft*, 299 Mich App at 80. Findings of fact are reviewed for clear error, and questions of law are reviewed de novo. *Id*. Because this Court denied defendant's motion to remand, and no *Ginther* hearing was held, this Court's review is limited to the existing record. *Abcumby-Blair*, 335 Mich App at 227.

As an initial matter, defendant properly refers to this allegation against the prosecutor as "misconduct" rather than "error" because he is alleging a violation of the rules of professional conduct. *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015). Less egregious conduct involving inadvertent or technical error is referred to as "prosecutorial error." *Id*. at 88. Defendant alleges that the prosecutor violated MRPC 3.4(e), which provides that a lawyer "shall not":

(e) during trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant, or the guilt or innocence of an accused[.]

As stated above, review of a claim of prosecutorial misconduct requires a determination "whether the defendant was denied a fair and impartial trial." *Bennett*, 290 Mich App at 475. "Every defendant has a due process right to a fair trial." *People v Rose*, 289 Mich App 499, 517; 808 NW2d 301 (2010). "[A]llegations of prosecutorial misconduct are considered on a case-by-case basis, and the reviewing court must consider the prosecutor's remarks in context." *Bennett*, 290 Mich App at 475. In general, prosecutors are afforded great latitude in their arguments and conduct; they are free to argue the evidence and all reasonable inferences arising from it as it relates to their theory of the case. *Bahoda*, 448 Mich at 282. Additionally, "[a] prosecutor may not inject unfounded and prejudicial innuendo into a trial." *People v Dobek*, 274 Mich App 58, 79; 732 NW2d 546 (2007).

Plaintiff was asked by his counsel about the proffer agreement during direct examination. On cross-examination, the prosecutor asked:

> *Q*. Okay. Now, this proffer—we're talking proffer—it was an opportunity for you to cooperate with law enforcement to get a deal for your case. Is that correct?
>
> *A*. Yes.
>
> *Q*. And that's because we asked you to cooperate and testify against Mr. Shaw, who is the shooter in this case. Is that correct?
>
> *A*. Yes.

Defendant was supposed to meet with the prosecutor, but there was a COVID-19 outbreak at the jail and a lockdown. When asked what happened in the 10-day delay, defendant said, "nothing"— he was in the COVID-19 lockdown. He denied telling people in the jail that he was cooperating and getting a deal. The prosecutor said it was reported that defendant was "bragging" about getting a deal to testify against Shaw, which defendant denied. Defendant denied speaking to Shaw in that 10-day period to coordinate their stories. The prosecutor then asked why it was a surprise to everyone involved in the proffered statement that defendant changed his story to say he was the shooter, and defendant responded that he never said he was not the shooter and denied changing his story.

Defendant argues that the prosecutor committed misconduct by injecting innuendo into trial that defendant changed his story or lied at the proffer interview and violated MRPC 3.4(e) by alluding to this fact without any evidence in the record that defendant lied or changed his story. The prosecution responds that there is evidence in the record to support the assertion that defendant previously indicated that Shaw was the shooter. The prosecution points out that the purpose of offering defendant the proffer agreement (which defendant acknowledged at trial) was to give him

an opportunity to cooperate and testify against Shaw, whom the prosecution asserted was the shooter. In other words, in agreeing to provide a proffered statement knowing that the prosecution intended to pursue a case against Shaw as the person who shot Williams, defendant was acknowledging that Shaw was the shooter.

As noted above, a defendant is entitled to a fair trial, "but not a perfect one for there are no perfect trials." *People v Miller*, 482 Mich 540, 559; 759 NW2d 850 (2008) (quotation marks and citation omitted). While the wording of the prosecution's questioning in this area was not perfect, we do not believe that the prosecutor's questioning rose to the level of prosecutor misconduct or a violation of MRPC 3.4(e). Because defendant admitted that he had been asked to cooperate against Shaw, and that he knew the prosecution believed Shaw to be the shooter, the prosecutor reasonably believed that the allegation that Shaw changed his story was supported by admissible evidence.[8] When the prosecutor asked whether anything occurred in between the proffer agreement being offered and defendant's actual interview, defendant denied that anything occurred, denied speaking to Shaw during that time, and denied that Shaw was the shooter. This questioning did not deny defendant a fair trial, and the court instructed the jury during preliminary and final jury instructions that the lawyers' questions to the witnesses were not evidence, and it should only consider the questions to give meaning to the witnesses' answers. As jurors are presumed to follow their instructions, *Fyda*, 288 Mich App at 465, defendant failed to establish that he was denied a fair trial, and the trial court did not err by denying defendant's motion for a new trial on this basis. Lastly, because the questioning by the prosecutor did not amount to a violation of the MRPC or prosecutor misconduct, defense counsel was not ineffective for failing to raise a futile objection to the questioning or make a meritless argument. *Ericksen*, 288 Mich App at 201.

## VII. SHAW LETTER

Defendant argues that his trial counsel was ineffective for failing to object to or move to strike portions of Shaw's letter that were read into the record, misquoted, and were inadmissible hearsay statements. We agree that the Shaw letter was not admissible in this case, but we conclude there was no plain error that affected defendant's substantial rights in the references and questioning regarding Shaw's letter, and trial counsel was not ineffective based on his delayed objection.

Defendant did not object to the admission of hearsay evidence at the time of trial and did not argue that he was entitled to a new trial on this basis in his postjudgment motion for a new trial. Again, to preserve an evidentiary issue for appeal, the party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal. *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). Defense counsel lodged a delayed objection to the Shaw letter on relevance grounds, asserting that defendant never read the letter. This is not the same hearsay grounds he argues on appeal; as such, this issue is not

---

[8] In a perfect trial, the prosecution might have asked defendant to concede that his very act of agreeing to provide a proffered statement, in this context, was an acknowledgement by defendant that Shaw was the shooter. But, as noted above, there are no perfect trials, *id.*, and we believe the questions posed by the prosecutor did not constitute prosecutorial misconduct.

preserved. It is therefore reviewed for plain error affecting substantial rights. *Lowrey*, 342 Mich App at 108.

Once again, whether a defendant was denied the effective assistance of counsel presents a mixed question of fact and constitutional law. *Heft*, 299 Mich App at 80. Findings of fact are reviewed for clear error, and questions of law are reviewed de novo. *Id*. Because this Court denied defendant's motion to remand, and no *Ginther* hearing was held, this Court's review is limited to the existing record. *Abcumby-Blair*, 335 Mich App at 227.

On cross-examination, defendant claimed that he did not know that Shaw said that defendant was the shooter until defendant received his discovery packet from his attorney. He denied getting mad at Shaw, and said he never spoke to Shaw after that. The prosecutor asked defendant if a trustee in jail tried to bring him a letter from Shaw that he refused to accept because he was mad at Shaw for blaming him, and defendant denied the assertion. Defendant did not read that letter until his proffer interview. When asked on cross-examination if Shaw apologized to defendant in the letter, defendant said he could not recall. The prosecutor then asked:

> Well, I'll—I'll tell you—I'll give you an example. And he says in this letter that he's sorry, okay? And he says to you he's sorry that he's putting you through this because his goal was to get you both out of trouble. Do you recall that? And then he says, "Listen, if I was going to tell them the truth about the situation as to what was really going on, but I didn't. I never once told them that we were trying to rob the guy." Do you recall him saying that?

Defendant answered no. The prosecutor then asked if defendant recalled Shaw admitting in the letter that defendant could say it was him, but to say " 'they came after me first.' " Defendant answered that he read the letter but not until his proffer interview. The prosecutor then asked if defendant recalled Shaw saying in the letter, " 'I was the shooter, go ahead and tell them I was the shooter, but just tell them that it was done in self-defense. I'll take the case.' " Defendant merely responded that he recalled reading the letter without confirming what was said.

Detective Cook was then recalled as a rebuttal witness, and he testified that the letter from Shaw was written to defendant but intercepted by a jail trustee and provided to law enforcement. Detective Cook testified that in the letter, Shaw apologized to defendant and acknowledged that he blamed defendant, did not tell the truth, and that this was a planned robbery. Detective Cook was present at defendant's proffer interview and said that the version of events defendant provided there was inconsistent with his trial testimony. Defense counsel agreed to a short segment of the video of the proffer interview being admitted into evidence. According to Detective Cook's testimony, defendant demonstrated during the interview that he was standing over Williams's body, straddling him, which defendant denied during his trial testimony. During defendant's proffered statement, he also indicated that Shaw came outside at one point during the incident, which defendant denied at trial, as detailed above.

Tolliver also testified on rebuttal that he was in jail in 2021. Because his conviction was for a nonviolent crime, he was in the trustee program and worked in the jail food service. He delivered food to inmates and was assigned to deliver food to Shaw in September 2021. Tolliver knew Shaw "[f]rom the news article that he was a suspect in my godson's killing." When Tolliver

delivered food to Shaw, Shaw asked him to pass a letter to defendant and Tolliver agreed. Tolliver did not read the letter then but brought it to defendant's cell. Defendant said he "wasn't f***ing" with his codefendant Shaw and did not accept the letter. Tolliver said defendant did not read the letter at that point. So Tolliver took the letter, read it, and gave it to Williams's mother because Williams was his godson, and they were very close. Tolliver said Shaw apologized to defendant for shooting him in the letter.

During Tolliver's testimony, the prosecutor stated he was going to show Tolliver the letter, but "[l]egally, we cannot admit it in this trial, but it is marked just so we have an identifier." After Tolliver said Shaw apologized in the letter, defense counsel objected on relevance grounds, saying defendant never read the letter. The prosecutor responded that it was being used for impeachment purposes because defendant claimed he was the shooter, but the prosecutor argued he was not and that Shaw apologized. The court stated it did not know if the contents of the letter were important, but it was allowed for impeachment purposes.

We conclude that although Shaw's letter was hearsay, the evidence did not affect the outcome of the proceedings, nor did it intrinsically undermine the fairness, integrity, or public reputation of the proceedings. See *Lowrey*, 342 Mich App at 109. At the time of defendant's trial, former MRE 801(c) defined hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." As provided by the former MRE 802, as a general rule, hearsay is inadmissible unless an exception applies. However, "[w]hen a witness claims not to remember making a prior inconsistent statement, he may be impeached by extrinsic evidence of that statement." *People v Jenkins*, 450 Mich 249, 256; 537 NW2d 828 (1995). See also former MRE 613(b) ("Extrinsic evidence of a witness's prior inconsistent statement is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require."). "The purpose of extrinsic impeachment evidence is to prove that a witness made a prior inconsistent statement— not to prove the contents of the statement." *Jenkins*, 450 Mich at 256.

The prosecution properly acknowledged that the Shaw letter itself was inadmissible, and it was not admitted as evidence at trial. Although the letter itself was not admissible as substantive evidence, the record reflects that the prosecution used the letter for impeachment purposes once defendant took the stand. See *People v Collier*, 426 Mich 23, 38; 393 NW2d 346 (1986) ("When a defendant at trial elects to waive his privilege not to testify and takes the stand, attempted impeachment is a time-honored method of advancing the truthfinding function."). The prosecution's theory was that defendant initially agreed to cooperate against Shaw, meaning, Shaw was the shooter. But at his proffer interview and at trial, defendant asserted he shot Williams. Thus, the prosecutor used Shaw's letter to attempt to impeach defendant because his trial testimony was inconsistent with what the prosecution understood to be his initial agreement to cooperate against Shaw. However, because defendant neither authored the letter nor read its contents during the relevant timeframe, it could not be properly used to impeach any statement by defendant in this matter, who acknowledged that Tolliver offered him the letter from Shaw. That said, due to the overwhelming amount of evidence demonstrating that Shaw was the person who shot Williams, including the testimony by Jackson who said Shaw apologized to defendant for shooting him, defendant cannot demonstrate that use of the Shaw letter by the prosecution affected the outcome of the proceedings. Likewise, references to the letter, which was not offered as

substantive evidence, cannot be said to have intrinsically undermined the fairness of the proceedings, or the integrity or public reputation of the proceedings. As such, there was no plain error in the prosecutor's questioning of defendant on cross in regard to the Shaw letter.

Defendant argues that defense counsel was ineffective for failing to object to the prosecutor's questions and failing to object on hearsay grounds. However, based on the existing record, there is no reasonable probability that counsel's failure to object to the hearsay evidence prejudiced the defendant. See *Lane*, 308 Mich App at 68. Even if defense counsel had made such an objection, and it was sustained by the trial court, evidence of Shaw apologizing to defendant for shooting him had already been entered into evidence via the testimony of Jackson, i.e., the jury would have been aware that Shaw apologized to defendant for shooting him, even if there had been no mention of Shaw's letter or its contents at trial. Therefore, defense counsel was not ineffective in relation to his actions or lack thereof regarding the Shaw letter.

## VIII. CRUEL OR UNUSUAL PUNISHMENT

Lastly, defendant argues that his sentence of mandatory LWOP for felony murder constitutes cruel or unusual punishment under the Michigan Constitution, Const 1963, art 1, § 16, and that the holding of *People v Hall*, 396 Mich 650; 242 NW2d 377 (1976),[9] providing otherwise, was wrongly decided. This Court is bound by that decision, which remains good law, and defendant is not entitled to resentencing.[10]

Although sentencing challenges related to the scoring of guidelines or accuracy of information relied on may be raised at sentencing, in a motion for resentencing, or in a motion to remand, in order to preserve them for appeal, *People v Clark*, 315 Mich App 219, 223; 888 NW2d 309 (2016), "[t]o preserve a claim that the defendant's sentences were unconstitutionally cruel or unusual, the defendant must raise the claim in the trial court," *People v Burkett*, 337 Mich App 631, 635; 976 NW2d 864 (2021). Defendant first raised this argument in his motion to remand filed in this Court. Because he did not raise this issue in the trial court, it is unpreserved, and unpreserved constitutional issues are reviewed for plain error affecting substantial rights. *Id*.

MCL 750.316(1) provides in pertinent part that "a person who commits any of the following is guilty of first degree murder and shall be punished by imprisonment for life without eligibility for parole: . . . (b) [m]urder committed in the perpetration of . . . robbery." The Michigan Supreme Court in *Hall*, 396 Mich at 657-658, determined that mandatory LWOP for felony murder is proportionate to the crime under the factors provided in *People v Lorentzen*, 387 Mich 167; 194 NW2d 827 (1972). These factors include:

---

[9] Overruled in part by *People v Parks*, 510 Mich 225, 255 n 9; 987 NW2d 161 (2022), and *People v Taylor*, ___ Mich ___; ___ NW3d ___ (2025) (Docket Nos. 166428 and 166654); slip op at 36.

[10] In *Taylor*, the Supreme Court stated, "[w]e do not disturb, at this time, *Hall*'s holding that Const 1963, art 1, § 16 permits a mandatory punishment of LWOP for defendants convicted of first-degree murder, so long as the defendant was at least 21 years of age at the time of the offense." *Taylor*, ___ Mich at ___; slip op at 36.

-17-

(1) the severity of the sentence relative to the gravity of the offense; (2) sentences imposed in the same jurisdiction for other offenses; (3) sentences imposed in other jurisdictions for the same offense; and (4) the goal of rehabilitation, which is a criterion specifically rooted in Michigan's legal traditions. [*Parks*, 510 Mich at 242 (quotation marks and citations omitted).]

The *Hall* Court determined that "[a] mandatory life sentence without possibility of parole for this crime does not shock the conscience," the power to establish sentences is given to the Legislature, and under the separation of powers doctrine, the Court has no discretion. *Hall*, 396 Mich at 658.

In *Parks*, 510 Mich at 244, the Court held that "the Michigan Constitution requires that 18-year-olds convicted of first-degree murder receive the same individualized sentencing procedure under MCL 769.25 as juveniles who have committed first-degree murder, instead of being subjected to a mandatory life-without-parole sentence like other older adults." The Court specifically held that its opinion only applied to 18-year-olds, and it declined to address the constitutional requirements for sentencing offenders over 18 at the time of the crime. *Id*. at 245. The Court also specifically noted that its holding did not affect the holding of *Hall* and the sentencing of defendants over 18 to mandatory LWOP. *Id*. at 255 n 9. As noted above, in *Taylor*, ___ Mich at ___; slip op at 36, the Michigan Supreme Court explicitly held that its ruling that mandatory LWOP for 19- and 20-year-old defendants was unconstitutional did not disturb the holding of *Hall* that a mandatory LWOP sentence was constitutional for defendants convicted of first-degree murder for defendants age 21 or older.

Defendant was over the age of 21 at the time of the shooting; he was 27 years old. As such, the trial court had no discretion but to impose a sentence of mandatory LWOP under MCL 750.316(1)(b). Under *Hall*, 396 Mich at 657-658, this sentence does not constitute cruel or unusual punishment under the Michigan Constitution, and the *Hall* decision remains binding precedent that this Court is required to follow. See *People v Beasley*, 239 Mich App 548, 559; 609 NW2d 581 (2000) (a decision of the Michigan Supreme Court is binding on lower courts under stare decisis). Therefore, there was no plain error in the trial court's sentencing and defendant is not entitled to resentencing.

Affirmed.

/s/ Randy J. Wallace
/s/ Anica Letica
/s/ Kathleen A. Feeney